UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------x
SAFETY MANAGEMENT SYSTEMS, INC.,                    10 Civ. 1593 (KBF)

                                    Plaintiff,

            - against -

SAFETY SOFTWARE LIMITED,

                                    Defendant.
------------------------------------------------------------x
SAFETY SOFTWARE LIMITED,

                        Counterclaim Plaintiff,

            - against -

SAFETY MANAGEMENT SYSTEMS, INC.,

                        Counterclaim Defendant,

        And

CHRISTIEN DUCKER,

                        Additional Counterclaim
                        Defendant.
------------------------------------------------------------x

### Jury Related Materials

        Defendant-Counterclaim Plaintiff Safety Software Limited ("SSL") sets forth

below the charges, instructions and verdict sheets[1] SSL proposes be included among the

materials the Court will read/submit to the jury:

(i)     **Safety Software Limited's Voir Dire Statement and Questions to Prospective Jurors**

        SSL respectfully submits the following as (1) a proposed preliminary statement by the

Court to prospective jurors identifying the parties and issues in the case, and (2) proposed

---

[1] SSL's proposed verdict sheets are attached as Exhibit A.

additional questions to be asked by the Court of prospective jurors in addition to standard questions concerning general background including residence, employment, education, marital and family status.

A.   Proposed Preliminary Statement Concerning Parties and
     Subject of Case

As background for some of the questions I will be asking you, I would like to give you a brief description of what is involved in this case. First I will identify the parties. The plaintiff in this case is Safety Management Systems, Inc. I will refer to it as "SMS". SMS also is a counterclaim defendant in this case, meaning the party it originally commenced suit against has brought its own claims against SMS in this action. SMS may present testimony from [from Joint Pre-Trial Memorandum].

The defendant in this case is Safety Software Limited. I will refer to it as "SSL". SSL is the counterclaim plaintiff that brought claims against SMS. SSL may present testimony from Paul Hurst, Rob Leech, Mark Swithenbank, Martin Jones, Ray Black (via deposition transcript excerpts), Christen Ducker, and Robert Vakos (via deposition transcript excerpts).

Lastly, Christien Ducker is the President and sole-shareholder of SMS. She also is a counterclaim defendant in this case, along with her company SMS. Ms. Ducker may testify in this case.

SMS is a business that until March 14, 2010 sub-licensed, marketed and distributed SSL's software and technology to businesses in North America.

SSL is the owner of software known as "AIRSWEB". SSL licenses AIRSWEB products to businesses, and collects royalties for the use of AIRSWEB. When the owner of software licenses a product to another company, it is giving that company permission to use that product,

2

usually for a fee. SSL also provides services relating to AIRSWEB, such as technical support, maintenance and hosting.

Let me tell you something about the dispute that underlies this lawsuit. As I mentioned earlier, SSL owns AIRSWEB. AIRSWEB is a software that tracks, analyzes and reports accidents and similar incidents in a company. AIRSWEB also is used to help companies comply with health and safety laws and regulations set by the government.

Pursuant to a Licensing Agreement that SMS and SSL entered into in August 2006, SMS was to pay SSL royalties. These royalties were to compensate SSL for SMS' customers' use of AIRSWEB. Under the License Agreement (the "Agreement"), SMS found companies that wanted to use AIRSWEB products and SMS entered into contracts with those companies to sub-license AIRSWEB. SMS was allowed to grant sub-licenses for AIRSWEB pursuant to the Agreement it had with SSL. Because SMS' customers were using SSL's product, SSL was owed royalties for their use, which SMS was supposed to pay SSL under the Agreement. SSL alleges that SMS never paid any royalties under the Agreement. SSL also alleges that it was not paid interest owed to it due to SMS' non-payment of royalties and other services that I will described later. In regards to royalties, SMS states that it was never invoiced for royalties and therefore it is not obliged to make any payments towards them.

SSL alleges that it provided support and development services to the sub-licensees at the request of SMS and invoiced SMS for these services, but that SMS paid only a small number of these invoices. SMS alleges that these services were additional, or "out-of-scope" services under the Agreement, and that SSL could only receive compensation for the performance of these out-of-scope services if it submitted a "change of request" form before conducting the work. SSL

3

asserts that the Agreement does not require SSL to submit a change of request form but rather it only requires that SMS request that SSL conduct the out-of-scope work.

SMS also alleges that SSL overbilled SMS for development and support work it provided to the sub-licensees. SSL asserts that SMS refused to pass-on the expense of SSL's work to the sub-licensees because SMS wanted to provide its customers with a superior product at minimal cost. SSL also assets that SMS was not prohibited under the sub-license agreements that SMS had with its customers from passing on the out-of-scope cost, and payment for the out-of-scope work was actually contemplated in those contracts. SSL further alleges that SMS never had any intention of charging the sub-licensees for much of the out-of-scope work that SSL provided.

Both parties assert that the other breached additional provisions of the Agreement. SMS alleges that SSL breached the Agreement because SSL failed to place its customers' "source code" in an escrow account with Mr. Scarola, SMS' attorney. SSL argues that SMS wanted the source code for the purpose of taking over SSL's business.

SMS also claims that SSL did not support SMS in pursuing new business opportunities because SSL did not approve certain new contracts that it presented to SSL. SSL refutes these claims and argues that under the Agreement SSL had a right to review, prior to approval, the proposed sub-license agreements. SSL also alleges that the new contracts that SMS presented to SSL required work that would cost SSL more to provide than the client would be required to pay to SMS.

SSL also alleges that SMS and Ms. Ducker intentionally withheld payments owed to SSL under the Agreement in an attempt to drive SSL into insolvency. SSL further alleges that Ms.

Ducker, while the Agreement was still in effect, attempted to steer business away from SSL and to SSL's primary competitor, Rivo Software.

Additionally, SSL asserts that it was never provided with SMS' insurance policy, something SMS was required to do under the Agreement.

Moreover, SSL also alleges it made loans to SMS that were never repaid.

Both parties agree that SMS terminated the Agreement, effective March 14, 2010. They disagree, however, about whether SMS had the continued right to exploit AIRSWEB, post-termination.

Lastly, SSL has sued Ms. Ducker in this dispute under a legal doctrine called piercing the corporate veil. This is a legal concept by which a corporation's shareholders, who generally are shielded from liability for the corporation's conduct, are held personally liable for certain actions. Both sides will present evidence about the applicability of this doctrine in this case and I will instruct you on the law regarding this doctrine at the conclusion of the case.

B.    Proposed Additional Voir Dire Questions

1.    Would you please identify any previous civil or criminal cases in which you have been involved as a juror? As a witness? Any civil cases in which you have been involved as a party? In each case tell us the name of the case if you can remember, the type of claim or issue involved in the case, and the outcome.

2.    Have any of you or a member of your family or close friends to your knowledge ever sued anyone or presented a claim against anyone, or been sued or had a claim presented against any of you? If so, please describe and state the outcome.

3.    For those of you who have been involved in previous cases, was there anything about that experience which you feel might cause you in any way to be predisposed

5

concerning the parties or the issues in this case as I have described them to you?

      4.    Is there anything about your experiences in any prior litigation as a juror, witness or party which might give you any difficulty in deciding this case impartially and strictly on the basis of the evidence and the Court's instructions?

      5.    Have you or any relatives or friends, or any company for which you have worked, to your knowledge, had any business dealings or relationships with any of the parties or attorneys in this case? If so, would you please briefly describe these?

      6.    Is there anything about any such business dealings or transactions which you feel might cause you to have any pre-existing opinions, judgments or attitudes about the parties or issues in this case? If so, please explain.

      7.    Is there anything about such business dealings or relationships which might cause you to have any difficulty in deciding this case impartially and strictly on the basis of the evidence and the Court's instructions?

      8.    During the trial of this case the following witnesses may be called to testify on behalf of the parties [the witnesses designated in the pretrial statement would then be identified]. Have any of you heard of or been otherwise acquainted with any of these witnesses? If so, please explain. Of course, the parties are not required and might not wish to call all of these witnesses and they may later find it necessary to call other witnesses.

      9.    Do any of you have any belief or feeling toward or about any of the parties or attorneys which might give you any difficulty in deciding this case impartially and solely on the basis of the evidence and the instructions given to you by the Court?

      10.    Have any of you heard of or do any of you have any knowledge of any of the facts or events in this case? [If so, please explore the details *in camera*.]

11.    Have you or any relatives or friends ever worked in the fields of information technology, technical support or workplace safety management?  If so, when, for what company and in what capacity?

12.    Is there anything about any such employment that you feel might cause you to have any pre-existing opinion, judgment or attitude concerning any of the parties or the issues in this case as I have described them to you?  If so, please explain.  Do you or any relatives or friends, to your knowledge, own any stock or have any investments in or with a company involved in either  information technology, technical support or workplace safety management?

13.    Is there anything about the fields of information technology, technical support or workplace safety management that would make it difficult for you to decide this case impartially and strictly on the basis of the evidence and the Court's instructions?

14.    Have you or any relatives or friends ever been involved in a commercial dispute in which one party was contending that another party had broken a contract? If so, please describe the nature of that dispute and how it was resolved.

15.    Is there anything about that dispute that you feel might cause you to have any pre-existing opinion, judgment or attitude concerning any of the parties or the issues in this case as I have explained them to you?

16.    Have you or any relatives or friends ever been involved in a commercial dispute in which one party was contending that another party had overcharged them?  If so, please describe the nature of that dispute and how it was resolved.

7

17.    Have you or any relatives or friends ever been involved in a commercial dispute in which one party was contending that the other party did not pay them for their work? If so, please describe the nature of that dispute and how it was resolved.

18.    Is there anything about that dispute that you feel might cause you to have any pre-existing opinion, judgment or attitude concerning any of the parties or the issues in this case as I have explained them to you?   If so, please explain.

19.    Have you or any relatives or friends ever been involved in a commercial dispute in which one party was contending that the other party used their property in a way that exceeded their permission?

20.    Is there anything about that dispute that you feel might cause you to have any pre-existing opinion, judgment or attitude concerning any of the parties or the issues in this case as I have explained them to you?   If so, please explain.

21.    Do any of you feel that a corporation is entitled to receive any different consideration in a court of law than an individual?

22.    Have you or any relatives or friends ever been involved in a commercial dispute in which one party contended that the other party did not provide adequate technical support concerning computer software? If so, please describe that experience.

23.    Do any of you feel that a corporation is entitled to receive any different consideration in a court of law than an individual?

24.    Are you, or are any of your relatives or friends, self-employed?

25.    Is there anything about that experience that would cause you to have any pre-existing opinion, judgment or attitude concerning any of the parties or issues in this case as I have explained them to you? If so, please explain.

8

26.    Do you, or any of your relatives or friends, own a small business?

27.    Is there anything about that experience that would cause you to have any pre-existing opinion, judgment or attitude concerning any of the parties or issues in this case as I have explained them to you?  If so, please explain.

(ii)    **Preliminary Instructions Before Opening Arguments:**

Members of the jury, we are about to begin the trial of this case. You have heard some details about this case during jury selection. Before the opening statements, however, there are certain instructions you should have in order to better understand the evidence that will be presented to you and how you should conduct yourself during trial. What I will now say is intended to serve as an introduction to the trial of this case. It is not a substitute for the detailed instructions on the law and the evidence that I will give you at the close of the case, before you retire to consider your verdict.

During the trial you will hear me use a few terms that you may not have heard before. Let me briefly explain some of the most common to you. Throughout this trial, and in these instructions, I will refer to Safety Management Systems, Inc. or "SMS" as the Plaintiff and Safety Software Limited or "SSL" as the Defendant.   SSL also has brought counterclaims against SMS and its sole-shareholder, Christien Ducker.  This means that SSL has sued SMS and Ms. Ducker.

Additionally, you will sometimes hear me refer to "counsel." "Counsel" is another way of saying "lawyer" or "attorney." I will sometimes refer to myself as the "Court."

When I "sustain" an objection, I am excluding that evidence from this trial for a good reason. When you hear that I have "overruled" an objection, I am permitting that evidence to be

admitted. When I say "admitted into evidence" or "received into evidence," I mean that this particular statement or the particular exhibit may be considered by you in making the decisions you must make at the end of the case.

By your verdict, you will decide disputed issues of fact. I will decide all questions of law that arise during the trial. Before you begin your deliberations at the close of the case, I will instruct you in more detail regarding the law that you must follow and apply.

Because you will be asked to decide the facts of this case, you should give careful attention to the testimony and evidence presented. Keep in mind that I will instruct you at the end of the trial about determining the credibility or believability of the witnesses. During the trial you should keep an open mind and should not form or express any opinion about the case until you have heard all of the testimony and evidence, the lawyers' closing arguments, and my instructions to you on the law. It is your duty as jurors to follow the law as I state it to you, and to apply that law to the facts as you find them from the evidence in the case. You are not to be concerned with the wisdom or soundness of any rule of law stated by me. Regardless of any opinion you may have as to what the law is or ought to be, it would be a violation of your sworn duty as jurors for you to base a verdict on any view of the law other than that given by me in my instructions. It would also be a violation of your sworn duty, as judges of the facts, to base a verdict on anything other than the evidence in this case. In particular, you may not perform any investigation of the case on your own, including through Internet searches, discussions with friends or family during the trial or review of media reports about the case.

The evidence presented to you during the trial will consist primarily of the testimony of witnesses and tangible items known as "exhibits." Any exhibit admitted into evidence during the trial will be available to you to study during your deliberations.

If you would like to take notes during the trial, you may do so, but you are not required to take notes if you don't want to. If you do take notes, be careful not to get so involved in note taking that you become distracted from the proceedings. Also, your notes should be used only as an aid to your memory. If your memory later should differ from your notes, you should rely on your memory and not your notes. If you do not take notes, you should rely on your own independent recollection or memory of what the testimony was, and you should not be unduly influenced by the notes or recollection of other jurors. Notes are not entitled to any greater weight than the recollection or impression of each juror about the testimony.

While the trial is in progress, you must not discuss the case in any manner among yourselves or with anyone else. In addition, you should not permit anyone to discuss the case in your presence. You should avoid reading any news articles or commentary that might be published about the case or about the parties and individuals involved in the case. Along these same lines, you should not try to access any information about the case or parties or do research on any issue that arises in the case from any outside source including the Internet. You should also not discuss the case with anyone, including on Internet social media networks like Twitter, Facebook and MySpace. And in the event you see anything in the media or on the Internet about this case, please turn away and pay it no attention. Your sworn duty is to decide this case solely and wholly on the evidence presented in the courtroom.

From time-to-time during the trial, I may make rulings on objections or motions made by the lawyers. It is a lawyer's duty to object when the other side offers testimony or other evidence that the lawyer believes is not admissible or appropriate for this trial. You should not view unfairly or be partial against a lawyer or the lawyer's client because the lawyer has made objections. If I sustain or uphold an objection to a question that goes unanswered by the witness,

you should not draw any inference or conclusion from the question. You should not infer or conclude from any ruling or other comment I may make that I have any opinion on the merits of the case favoring one side or the other. I do not favor one side or the other.

The trial lawyers are not allowed to speak with you during this case. When you see them at a break in the trial or pass them in the halls and they do not speak to you, they are not being rude or unfriendly. They are simply following the law and my instructions.

During the trial, occasionally I may need to confer with the lawyers out of your presence on questions of law or procedure that require consideration by me alone. On some occasions you may be excused from the courtroom. Sometimes these "bench" conferences or "side-bars" serve to speed things along. I will try to limit these interruptions as much as possible, but you should remember the importance of the matter you are here to determine, and should be patient.

Finally, please do not discuss the case even among yourselves until all the evidence has been presented and the case has been given to you for your deliberations. The reason for this is that the evidence will be presented one witness and one exhibit at a time, and it is important that you keep an open mind until you have heard all the evidence.[2]

The case will proceed as follows:

First, the lawyers for each side may make opening statements. What is said in the opening statements is not evidence but is simply an outline to help you understand what each party expects the evidence to show. A party is not required to make an opening statement.

After the opening statements, SMS will present evidence in support of its claim and SSL's lawyers may cross-examine the witnesses. At the conclusion of SMS's case, SSL may introduce evidence and SMS and Ms. Ducker's lawyers may cross-examine the witnesses.

---

[2] O'Malley, Grenig & Lee, *Federal Jury Practice & Instructions - Civil*, Vol. 3, § 101.01 (5th ed. 2000) (modified); Sand, et al., *Modern Federal Jury Instructions*, Instruction 71-15 (2010) (modified).

After the evidence is presented, the parties' lawyers will make closing arguments explaining what they believe the evidence has shown. What is said in closing arguments is not evidence.

Finally, I will instruct you on the law that you are to apply in reaching your verdict. You will then decide the case.

Now, we will begin by giving the lawyers for each side an opportunity to make their opening statements in which they may explain the issues in the case and summarize the facts they expect the evidence will show. So I ask that you now give counsel your close attention as I recognize them for purposes of opening statements.[3]

(iii)    **Elements of Claims To Be Incorporated In the Judge's Charges to the Jury**

(1)    SSL's Breach of Contract Claim Against SMS;

SSL seeks to recover damages for breach of contract from SMS. SSL's breach of contract claims are governed under English law. Because England and the United States are governed by the common law, we will assume that English law is the same as New York law. Based on *Dataserv, Ltd. v. Mgm't Techs., Inc.*, 1993 WL 138852, at *8, n. 3 (S.D.N.Y. Apr. 27, 1993)(citing *Loebig v. Larucci*, 572 F.2d 81, 85 (2d Cir. 1978).

To succeed on a breach of contract claim, SSL must prove all of the following:  (1) the existence of a contract; (2) that SSL has performed its obligations under the contract; (3) that SMS failed to perform its obligations under the contract; and (4) that SSL suffered damages because of the breach. Based on *Medtech Products Inc. v. Ranir, LLC*, 596 F. Supp. 2d 778, 807 (S.D.N.Y. 2008).

---

[3] O'Malley, Grenig & Lee, *Federal Jury Practice & Instructions-Civil*, Vol. 3 § 101.02 (5th ed. 2000) (modified).

1.     **The Existence of an Agreement**

In this case neither party contests the existence of the License Agreement (the "Agreement"), so you do not need to analyze that element.  Assume that the Agreement between the parties is a valid and enforceable contract.

2.     **Did SSL Render "Due Performance"?**

As previously instructed, SSL asserts that it provided all necessary services and support to SMS and its U.S. sub-licensees under the Agreement; SMS disputes this.  SMS alleges that SSL owes it money for hosting costs for the time period before SMS terminated the Agreement, while SSL asserts that the Agreement does not even cover the subject of hosting.  If you find that SSL performed its obligations under the Agreement and that the Agreement did not discuss hosting, then you must consider whether SMS breached the Agreement.

3.     **Did SMS Breach the Agreement?**

SSL claims that SMS breached the Agreement by:

1. not paying SSL for technical assistance it provided to SMS' customers at SMS' request pursuant to Section 5 of the Agreement;

2. not providing royalty statements pursuant to Section 9 of the Agreement;

3. not paying SSL royalties on a quarterly basis within 30 days of the end of each quarter pursuant to Section 9 of the Agreement;

4. not paying SSL interest due to it under Section 9 of the Agreement for its late payments;

5. exploiting AIRSWEB products, in ways not authorized under Section 2 of the Agreement;

6. not obtaining insurance coverage to indemnify SSL against all or any costs, claims, damages or expenses SSL incurred as a result of any breach of any of SMS' obligations under the Agreement, in violation of Section 3 of the Agreement;

7. encouraging its employees to steer work to Rivo Software ("Rivo"), an SSL competitor, and away from SSL to Rivo while the Agreement was still in effect, in violation of Section 3 of the Agreement; and

8. permitting and encouraging its employees to provide Rivo with SSL's confidential information, in violation of Section 8 of the Agreement.

If you find that the SMS did not adequately perform its obligations under the Agreement and that SSL did perform its obligations under the Agreement, then you must consider whether SMS' breaches were material.

Based on 28 N.Y. Prac., Contract Law § 17:12 (Mar. 2012).

A.    *If There Was a Breach, Was it Material?*

If you find that SMS did breach the Agreement, you must also determine if that breach was "material." A material breach is a failure to do something that is so fundamental to a contract that the failure to perform that obligation defeats the essential purpose of the contract or makes it impossible for the other party to perform under the contract. In other words, for a breach to be material, it must "go to the root" or essence of the agreement between the parties, or be one which touches the central purpose of the contract and defeats the object of the parties in entering into the contract.

If you find that paying SSL for the technical assistance provided to SMS' customers at SMS' request went to the root or essence of the Agreement, then SMS' failure to provide payment is a material breach.

If you find that paying SSL royalties for the use of AIRSWEB products went to the root or essence of the Agreement, then SMS' failure to pay such royalties is a material breach.

If you find that the timely payment of royalties and interest pursuant to Section 9 of the Agreement went to the root or essence of the Agreement, then SMS' failure to make timely payments is a material breach.

If you find that controlling the exploitation of AIRSWEB products went to the root or essence of the Agreement, then SMS' unauthorized exploitation of AIRSWEB software is a material breach.

If you find that obtaining insurance coverage to indemnify SSL against all or any costs, claims, damages or expenses SSL incurred as a result of any breach of any of SMS' obligations under the Agreement went to the root or essence of the Agreement, then SMS' failure to obtain coverage is a material breach.

If you find that steering business to SSL and not SSL's competitors went to the root or essence of the Agreement, then SMS' conduct of steering business to Rivo, an SSL competitor, while the Agreement was in place, is a material breach.

If you find that protecting SSL's confidential information went to the root or essence of the Agreement, then SMS' acts of sharing such information with its competitors is a material breach.

Based on *Metro. Nat. Bank v. Adelphi Academy*, 23 Misc. 3d 1132(A), 886 N.Y.S.2d 68 (Sup. Ct. Kings Co. 2009).

4.    **Damages**

It is for you to decide on the evidence presented and the rules of law I have given you whether SSL is entitled to recover from SMS. If you decide that SSL is entitled to recover will you must consider my instructions concerning damages.

A.    *Generally*

The basic principle of damages in a contract action is to leave the injured party in as good a position it would have been if the contract had been fully performed. A party asserting breach of contract must establish that the breach caused the damages claimed.

Based on N.Y. Pattern Jury Instr., Civil 4:20 (3d ed. Dec. 2011).

16

B.     _Causation_

An award of damages is based on consequences which are the direct and proximate result of the wrong.  By "direct cause" I mean damages that can be directly traced to a breach of a contract.  By "proximate cause" I mean a cause sufficiently related to the damages SSL alleges to have sustained as a result of SMS' breach.  If you find that the damages SSL claims are either (a) sufficiently related to the damages SSL alleges to have sustained or (b) traceable to the alleged breach, then you must rule in favor of SSL.

For example, if you find that SMS breached the Agreement by not paying SSL for technical assistance it provided to SMS' customers, then you may find that SMS' non-payment is traceable to the breach.

By way of another example, if you find that SMS breached the Agreement by steering business to Rivo, then you may find that the lost value of this business is traceable to the breach.

Along these same lines, if you find that SSL shared pricing information with Rivo, and that information was confidential, then you may find that losses that resulted from sharing this information are traceable to the breach.

36 N.Y. Jur. 2d Damages § 14 (Sep. 2012).

(2)     SSL's Quantum Meruit Claim Against SMS:

**Explanation of Quantum Meruit**

A party bringing a suit for quantum meruit seeks to recover the value of their work, labor, or services.

**Ability to Recover Despite Existence of Agreement**

Typically, the existence of a valid contract covering the same subject matter of a quantum meruit claim precludes a claim for quantum meruit.  However, there are several exceptions to

17

this general rule. If you find that SMS disputes that it is bound by the Agreement, you may allow SSL to proceed against SMS both for breach of contract and for quantum meruit.

If you find that the Agreement does not cover the money SSL says it is owed for services it provided to the U.S. sub-licensees at SMS' request, then SSL is permitted to assert its quantum meruit claim. Here, there is a dispute between the parties concerning whether SSL's charges for development services provided to U.S. sub-licensees is covered by the Agreement. If you find that SSL could not issue invoices under the Agreement for out-of-scope work that was not approved through change of request forms, then SSL can proceed on this claim for quantum meruit. If on the other hand, you find that the Agreement allowed SSL to issue to SMS invoices for out-of-scope work not provided for in change of request forms, then you should not consider this claim for quantum meruit as SSL's claim is one for breach of contract.

A quantum meruit claim is also proper if you find that SMS and SSL entered into the Agreement but the amount of compensation due to SSL under the Agreement was unclear. If you find this to be the case, then SSL may sue SMS both for breach of contract and quantum meruit. Here, SMS alleges that much of the work SSL invoiced to it was outside the scope of the Agreement, and in any event, SSL should not be paid for work where no change of request form was submitted. SSL asserts that the Agreement between SSL and SMS and Schedule A of the contracts between SMS and the U.S. sub-licensees makes clear that a change of request form was not required, and the work SSL performed was covered by the Agreement.

If you find for any reason that the some or all services that SSL billed to SMS are not covered by the Agreement, then you must examine whether SSL has stated a valid quantum meruit claim against SMS using the instructions that I will provide to you.

Based on 28 N.Y. Prac., Contract Law §4:9 (Mar. 2012).

### Elements of Quantum Meruit Claim

SSL must establish: (1) the performance of services in good faith; (2) the acceptance of its services by SMS; (3) an expectation of compensation for rendering the services; and (4) the reasonable value of SSL's services.

Based on *In re Alu*, 302 A.D.2d 520, 755 N.Y.S.2d 289 (2d Dep't 2003).

### Burden of Proof

SSL must establish its claim by a fair preponderance of the evidence.

Based on *Sawyer v. Wilcox' Estate*, 16 Misc. 2d 429, 431, 184 N.Y.S.2d 673, 675 (Sur. Ct. Ontario Co. 1959).

### The Performance of Services in Good Faith

You must examine whether evidence presented at trial shows that SSL performed services in "good faith."

The concept of good faith, is an intangible and abstract quality with no technical meaning or definition in the law. "Good faith" encompasses, among other things, the absence of a design to defraud or to seek an unconscionable advantage over SMS. Here, SSL alleges that it performed work at the request of SMS. If you find that SSL performed these services pursuant to SMS' request then you should find that SSL performed services in "good faith."

Additionally, although SMS alleges that the amount of SSL invoiced it was "excessive," if you find that that the evidence does not prove that SSL engaged in fraudulent or unconscionable conduct in performing services it provided to SMS, this element is satisfied. Evidence regarding SSL's billing practices bears on the fourth factor in the quantum meruit analysis—the reasonable value of the services, which we will examine later.

Based upon *Muller Boat Works, Inc. v. Unnamed 52' House Barge*, 464 F. Supp. 2d 127, 141 (E.D.N.Y. 2006).

### The Acceptance of Services

As a general rule, the performance and acceptance of services gives rise to the inference of an implied contract to pay for the reasonable value of such services. If you find that SMS accepted SSL's services, then you should rule that there was an implied agreement to pay for such services.

Based on *In re Alu*, 302 A.D.2d 520, 755 N.Y.S.2d 289 (2d Dep't 2003).

### An Expectation of Compensation for Rendering Services

In this case, SMS alleges that SSL did not have an expectation for payment, but instead worked for free to help SMS promote AIRSWEB in North America. Based on the evidence presented to you, you must determine whether SSL agreed to work with the expectation that it would not receive any payment for its work. If you believe that SSL agreed to work for free, you must rule in favor of SMS.

If on the other hand, if you believe that SSL had an expectation to be paid for the work it performed, you must rule in favor of SSL. One of the factors that Courts consider when determining whether a party had an expectation of payment is whether a bill was submitted for services rendered. Here, there is no dispute that SSL invoiced SMS for services.

Based on *Davis & Mamber, Ltd. v. Adrienne Vittadini, Inc.*, 212 A.D.2d 424, 425, 622 N.Y.S.2d 706, 707 (1st Dep't 1995) and In re Alu, 302 A.D.2d 520, 755 N.Y.S.2d 289.

### The Reasonable Value of Services

Damages for quantum meruit are generally awarded based on an hourly rate, except for limited exceptions where there is a "clear and accepted marketplace convention" establishing compensation on a percentage basis. Here, neither party argues that there is a marketplace convention and therefore you should award damages based on an hourly rate.

20

*Carlino v. Kaplan*, 139 F. Supp. 2d 563, 564 (S.D.N.Y. 2001).

     (3)    SSL's Breach of Contract Claim Against SMS Regarding Loans;

### Elements for Breach of Contract

     SSL seeks to recover damages for breach of contract for SMS' failure to pay back $268,695 (not including interest) for loans that SSL provided to SMS. SSL's breach of contract claims are governed under English law. Because England and the United States are governed by the common law, we will assume that English law is the same as New York law.

Based on *Dataserv, Ltd. v. Mgm't Techs., Inc.*, 1993 WL 138852, at *8, n. 3 (S.D.N.Y. Apr. 27, 1993)(*citing Loebig v. Larucci*, 572 F.2d 81, 85 (2d Cir. 1978).

     To succeed on a breach of contract claim, SSL must prove all of the following: (1) the existence of a contract; (2) that SSL has performed its obligations under the contract; (3) that SMS failed to perform its obligations under the contract; and (4) that SSL suffered damages because of the breach.

Based on *Medtech Products Inc. v. Ranir, LLC*, 596 F. Supp. 2d 778, 807 (S.D.N.Y. 2008).

1.    **The Existence of an Agreement**

     In this case neither party contests that SSL and SMS agreed that SSL would loan SMS money; however, the parties dispute the amount loaned.

2.    **Did SSL Render "Due Performance"?**

     Neither party contests that SSL provided money to SMS pursuant to their agreement; however, the parties dispute the amount loaned.

3.   **Did SMS Breach the Agreement?**

SSL claims that SMS breached its agreement to repay SSL for the loans SSL made to SMS.  SSL asserts that it loaned SMS $78,236 in 2004 and SMS failed to repay these loans. SMS asserts [add testimony and evidence from trial].

SSL's also alleges that it loaned $163,993 to SMS in 2005.  SMS admits to receiving this loan but asserts that it is unsure whether these loans have been paid off.  Namely, SMS is not sure if SSL applied payments that SMS made under the Licensing Agreement against the amount SMS owed to SSL for the 2005 loans.  SSL states that it did not apply monies it received under the Licensing Agreement to the 2005 loans.

SMS also claims that SSL may have agreed to re-categorize the 2005 loans it made to SMS but it is not sure.  SSL states that it never absolved SMS of its responsibility to pay SSL back for the loans it made to SMS and SMS has no basis to believe that it does not have to pay SSL back for these loans.

SSL asserts it loaned $26,466 to SMS in 2006.  SMS asserts [add testimony and evidence from trial].

A.   *If There Was a Breach, Was it Material?*

If you find that SMS did breach the agreement it had with SSL to pay back it back for the loans SSL made, you must also determine if that breach was "material."  A material breach is a failure to do something that is so fundamental to an agreement that the failure to perform that obligation defeats the essential purpose of the agreement or makes it impossible for the other party to perform under the agreement.  In other words, for a breach to be material, it must "go to the root" or essence of the agreement between the parties, or be one which touches the central purpose of the contract and defeats the object of the parties in entering into the contract.

22

If you find that paying SSL for the loans it made to SMS, went to the root or essence of the agreement, then SMS' failure to repay the loans is a material breach.

Based on *Metro. Nat. Bank v. Adelphi Academy*, 23 Misc. 3d 1132(A), 886 N.Y.S.2d 68 (Sup. Ct. Kings Co. 2009).

4.    **Damages**

It is for you to decide on the evidence presented and the rules of law I have given you whether SSL is entitled to recover from SMS. If you decide that SSL is entitled to recover will you must consider my instructions concerning damages.

A.    *Generally*

The basic principle of damages in a contract action is to leave the injured party in as good a position it would have been if the contract had been fully performed. A party asserting breach of contract must establish that the breach caused the damages claimed.

Based on N.Y. Pattern Jury Instr., Civil 4:20 (3d ed. Dec. 2011).

B.    *Causation*

An award of damages is based on consequences which are the direct and proximate result of the wrong. By "direct cause" I mean damages that can be directly traced to a breach of a contract. By "proximate cause" I mean a cause sufficiently related to the damages SSL alleges to have sustained as a result of SMS' breach. If you find that the damages SSL claims are either (a) sufficiently related to the damages SSL alleges to have sustained or (b) traceable to the alleged breach, then you must rule in favor of SSL.

If you find that SMS breached the agreement it had with SSL by not paying SSL for the loans it provided, then you may find that SMS' non-payment is traceable to the breach.

36 N.Y. Jur. 2d Damages § 14 (Sep. 2012).

(4)    SSL's Veil-Piercing Claim Against Christien Ducker;

### Explanation of Piercing the Corporate Veil

The avoidance of personal liability is a privilege of doing business through a corporation. Piercing the corporate veil allows courts to disregard the corporate form whenever necessary to prevent fraud and hold a corporate owner liable for the corporation's obligations. I will provide you with instructions on the requirements to pierce the corporate veil.

Based on *Matter of Morris v. New York State Dept. of Taxation & Fin.*, 82 N.Y.2d 135, 140–141, 603 N.Y.S.2d 807, 623 N.E.2d 1157 (1993) and *C.A.B. v. Scottish-Am. Ass'n, Inc.*, 411 F. Supp. 883 (E.D.N.Y. 1976).

### Requirements for Piercing the Corporate Veil

To pierce the corporate veil, SSL must demonstrate that: (1) Ms. Ducker exercised complete domination over SMS with respect to the transactions attacked; and (2) that such domination was used to commit a fraud or wrong that injured SSL.

Based on *Am. Fuel Corp. v. Utah Energy Dev. Co.*, 122 F.3d 130 (2d Cir. 1997).

### Domination and Control

While SSL does not need to prove Ms. Ducker's complete domination of SMS in every detail, SSL must show that Ms. Ducker's domination of SMS was complete in regards to any one of the following transactions: (1) Ms. Ducker's manipulation of SMS to withhold funds due to SSL under the Agreement; (2) Ms. Ducker's use of SMS to meet her own needs, such as using the confidential information she obtained under the Agreement to her advantage and to SSL's detriment; (3) Ms. Ducker's failure to obtain the necessary insurance coverage to indemnify SSL in the event that SMS breached the Agreement; or (4) Ms. Ducker's comingling (mixing) her own funds with the funds of SMS. SSL also can pierce the corporate veil by showing that SMS was insolvent during the time the Agreement was in place, but this is not a requirement.

24

Based on *Freeman v. Complex Computing Co.*, 119 F.3d 1044 (2d Cir. 1997); *Gorril v. Icelandair/Flugleidir*, 761 F.2d 847 (2d Cir. 1985) and *Network Enter. Inc. v. APBA Offshore Prods., Inc.*, 427 F. Supp. 2d 463, 487 (S.D.N.Y. 2006).

<u>Factors to Examine in Deciding Whether Ducker Dominated and Controlled SMS</u>

There are numerous factors that you can examine that bear on the issue of the amount of domination and control, if any, that Ms. Ducker exercised over SMS. These factors include but are not limited to the following:

- the perpetration of fraud by means of the corporate vehicle. SSL alleges that Ms. Ducker manipulated SMS' corporate books so that it would not have to pay SSL in order to drive SSL into bankruptcy and take clients using AIRSWEB products with her to Rivo, who offered her bonuses for clients she brought in. If you find this to be true you may find that Ms. Ducker dominated and controlled SMS;

- the absence of formalities of a normal corporate existence, such as the issuance of stock, the election of directors, and keeping corporate records. SSL alleges that SMS lacks these formalities and failed to hold formal shareholders' meetings where corporate minutes were taken. If you find this to be true you may find that Ms. Ducker dominated and controlled SMS;

- inadequate capitalization of SMS. SSL alleges that SMS was operating "in the red" and was not profitable during the time the Agreement was in place. In addition to being inadequately capitalized, Ms. Ducker increased the risk that SSL would be unable to collect against SMS by her willful failure to obtain the insurance policy required under the Agreement. If you find this to be true you may find that Ms. Ducker dominated and controlled SMS;

- the existence of activity conducted to strip the SMS of assets in anticipation of impending legal liability. SSL alleged that Ms. Ducker did not obtain insurance required by the Agreement, that would pay SSL in the event that SMS breached the Agreement. SSL also alleges that Ms. Ducker drove SMS out of business by paying herself and her friends a salary that would place SMS into insolvency. If you find this to be true you may find that Ms. Ducker dominated and controlled SMS;

- Ms. Ducker's use of SMS for personal business. SSL alleges that Ms. Ducker used SMS' funds to secure a position at Rivo by paying for meetings she had with Rivo while simultaneously taking actions to delay signing Unilever as a client so Rivo could service Unilever after Ms. Ducker terminated the Agreement with SSL. SSL also alleges that Ms. Ducker used SMS' payroll to award herself and her friends a salary that SMS could not afford to pay. Moreover, SSL alleges that Ms. Ducker used SSL's intellectual property, without authorization, so Ms. Ducker could negotiate her own employment at

Rivo. If you find these allegations to be true you may find that Ms. Ducker dominated and controlled SMS;

- Ms. Ducker's personal use of SMS' funds or Ms. Ducker's shuttling her personal funds in and out of SMS. SSL alleges that Ms. Ducker used SMS' money to pay for meetings between Ms. Ducker and Rivo so that Ms. Ducker could secure employment after SMS terminated the Agreement. If you find this to be true you may find that Ms. Ducker dominated and controlled SMS;

- Ms. Ducker's personal receipt of SMS' receivables and commissions from clients. SSL alleges that Ms. Ducker held money in her account that was not hers but instead belonged to SSL. If you find this to be true you may find that Ms. Ducker dominated and controlled SMS;

No single one of these factors is determinative; instead, liability can be imposed to reach a fair and just result. In fact, there are an infinite variety of situations that might call for disregarding the corporate veil, the ultimate question of veil piecing must be decided by considering the totality of evidence and not just the factors I just described to you.

Based on 14 N.Y. Jur. 2d Business Relationships § 39 (Sep. 2012); *Bridgestone/Firestone, Inc. v. Recovery Credit Services, Inc.*, 98 F.3d 13 (2d Cir. 1996) and *In re InSITE Svs. Corp. LLC*, 287 B.R. 79, 97 (Bankr. S.D.N.Y. 2002).

For example, domination and control is present where a party was the "driving force" behind a corporate entity's unauthorized use of intellectual property, including trade secrets. SSL alleges that Ms. Ducker shared its intellectual property with Rivo. If you find these facts to be true you may find that Ms. Ducker dominated and controlled SMS.

Based on *In re InSITE Svs. Corp. LLC*, 287 B.R. at 98 and *NetTech Solutions, LLC v. ZipPark.com*, 2001 WL 1111966, at *12 (S.D.N.Y. Sep. 20, 2001).

Where a corporate officer devises a "game plan" to violate contractual obligations concerning a potential future contract, to then provide a competitor with the anticipated fruits of that future contract, such domination is sufficient to show that the corporate officer dominated the corporation and should be subject to personal liability. Here, SSL alleges that Ms. Ducker, in February 2010 while the License Agreement was still in effect, met with the President of SSL's

primary competitor, Rivo, and plotted with him to steer to Rivo and away from SSL controls with General Mills, Unilever and GPIC. If you find this to be true you may find that Ms. Ducker dominated and controlled SMS.

Based on *Network Enter. Inc.*, 427 F. Supp. 2d at 468.

### Was Domination Used to Commit a Fraud or Wrong?

If you find that Ms. Ducker dominated and controlled SMS, you must also find that such domination was used to commit a fraud or wrong that injured SSL in order to pierce the corporate veil. Like my instructions concerning domination and control, there are many ways that someone can commit a fraud or wrong. I will provide you with a few examples of how someone can commit a fraud or wrong but my examples are only illustrations, meaning if you find that Ms. Ducker dominated and controlled SMS and committed fraud or wrong in a way that I have not described, you may still pierce the corporate veil.

Based on *Am. Fuel Corp. v. Utah Energy Dev. Co.*, 122 F.3d 130 (2d Cir. 1997).

If you find that the evidence established that Ms. Ducker dominated and controlled SMS and she used this control to induce SSL to continue providing services that SSL would not be paid for, then you may pierce the corporate veil. Here, SSL alleges that SMS never had any intention of paying SMS for most of the out-of-scope services that SSL provided to the U.S. licensees at the request of SMS. SSL points to evidence that includes SMS' failure to object to SSL received payments from SMS for invoices that SMS now argues are vague or inflated. SSL also alleges that in most instances, SMS did not bill the U.S. sub-licensees for services SSL provided to them, at the request of SMS—despite SMS' ability to do so under Schedule A of the contracts it had with the U.S. sub-licensees. If you find that Ms. Ducker dominated and

controlled SMS and used that control in the ways I have described, then you may pierce the corporate veil.

Based on *Hyland Meat Co., Inc. v. Tsagarakis*, 202 A.D.2d 552, 553, 609 N.Y.S.2d 625, 626 (1994).

If you find that Ms. Ducker dominated and controlled SMS and she used this control to finagle with SMS' corporate books to harm SSL or to escape the debt SMS owed to SSL, you may pierce the corporate veil.

Based on *Badian v, Elliot*, 165 Fed. Appx. 886, 889-90 (2d Cir. 2006); *Aires Ventures Ltd. v. Axa Finance, S.A.*, 729 F. Supp. 289, 297 (S.D.N.Y. 1990); *James v. Loran Realty V Corp.*, 61 A.D.3d 561, 532 (1st Dep't 2009).

Even if you find that Ms. Ducker dominated and controlled SMS but she did not use this control to defraud SSL, you may still pierce the corporate veil if you find that she used this domination and control to violate a positive legal duty owed to SSL or if she undertook a dishonest or unjust act in contravention of SSL's legal rights. Here, SSL alleges that Ms. Ducker devised a plan to drive SSL into insolvency so her affiliates would buy SSL out of insolvency and acquire complete control of SSL's software and U.S. based clients. If you find this to be true you may pierce the corporate veil.

Based on *Merino v. Beverage Plus S,. Corp.*, 2001 WL 3739030, at *4 (S.D.N.Y. Apr. 12, 2011).

If you find that Ms. Ducker misappropriated SSL's trade secrets to aid her in her employment negotiations with Rivo you may also pierce the corporate veil.

*NetTech Solutions, LLC v. ZipPark.com*, 2001 WL 1111966, at *12 and *In re InSITE Svs. Corp. LLC*, 287 B.R. at 98.

(5)    SMS' Breach of Contract Claim Against SSL:

Plaintiff Safety Management Systems, Inc. ("SMS") seeks to recover damages for breach of contract from Safety Software Limited ("SSL"). To succeed on a breach of contract claim,

SMS must prove all of the following: (1) the existence of a contract; (2) that SMS has performed its obligations under the contract; (3) that SSL failed to perform its obligations under the contract; and (4) that SMS suffered damages because of the breach.

Based on *Medtech Products Inc. v. Ranir*, LLC, 596 F. Supp. 2d 778, 807 (S.D.N.Y. 2008).

1.    **The Existence of an Agreement**

In this case neither party contests the existence of the License Agrement (the "Agreement"), so you do not need to analyze that element.  Assume that the Agreement between the parties is a valid and enforceable contract.

2.    **Did SMS Render "Due Performance"?**

A party asserting a breach of contract claim must demonstrate its own adequate performance of that contract.  A party that breaches a contract cannot enforce other provisions of that contract.  A party asserting a breach of contract must also prove not only that it performed its obligations under the terms of the contract but also that it was ready, willing, and able to do all that the contract required of it.

Since SMS is asserting a breach, it must show that it complied with its obligations under the Agreement in all respects.  If SMS did not fulfill its obligations under the terms of the Agreement it cannot prevail in its breach of contract claim against SSL.  If SMS cannot show that it was ready, willing, and able to do all that the Agreement required of it, it also cannot prevail on this claim.

In this case, the parties disagree about whether SMS performed its duties under the Agreement.  On one hand, SMS denies that it failed to perform its obligations under the Agreement.  On the other hand, SSL alleges that SMS failed to perform it duties under the Agreement, by:

1.     not paying SSL for technical assistance it provided to SMS' customers, at SMS' request, pursuant to Section 5 of the Agreement;

2.     not providing royalty statements pursuant to Section 9 of the Agreement;

3.     not paying SSL royalties on a quarterly basis within 30 days of the end of each quarter pursuant to Section 9 of the Agreement;

4.     not paying SSL interest due to it under Section 9 of the Agreement for its late payments;

5.     exploiting AIRSWEB software, in ways not authorized under Section 2 of the Agreement;

6.     not obtaining insurance coverage to indemnify SSL against all or any costs, claims, damages or expenses SSL incurred as a result of any breach of any of SMS' obligations under the Agreement, in violation of Section 3 of the Agreement;

7.     encouraging its employees to steer work to Rivo Software ("Rivo"), an SSL competitor, and away from SSL to Rivo while the Agreement was still in effect, in violation of Section 3 of the Agreement; and

8.     permitting and encouraging its employees to provide Rivo with SSL's confidential information, in violation of Section 8 of the Agreement.

If you find that the SMS did not adequately perform is own obligations under the Agreement, then SMS has breached the Agreement and cannot pursue a breach of contract claim against SSL.

Based on 28 N.Y. Prac., Contract Law § 17:12 (Mar. 2012).

3.    **Did SSL Breach the Agreement?**

SMS claims that SSL breached its obligations under the Agreement. For the sake of ease, I have separated the claims SMS makes against SSL for breach of contract into two time periods: before the Agreement was terminated and after the Agreement was terminated.

<u>Pre-Termination Claims Asserted by SMS</u>

SMS alleges that SSL, under the Agreement, owes it money for hosting costs for the time period before SMS terminated the Agreement. SSL contends that the Agreement does not even cover the subject of hosting and therefore there can be no breach of the Agreement relating to hosting. If you find that the Agreement did not contemplate hosting costs you must find for SSL.

SMS also claims that SSL breached the Agreement by not providing necessary support to SMS' customers, the U.S. sub-licensees. SSL asserts that it provided necessary support services, and it is clear that the U.S. sub-licensees were satisfied with SSL's services because they still use of SSL to this day. If you find that SSL provided the U.S. sub-licensees with adequate support you must find for SSL.

SMS claims that SSL also overbilled it for the services that SSL did perform. SSL asserts that SMS' invoicing procedures were accurate and that SMS did not object to SSL's allocation of payments received from SMS to invoices that SMS now claims are vague and inflated. SSL further claims that even if SMS disputes the total amount that SSL invoiced to SMS, SMS has expressly recognized that as of July 31, 2009, SMS owed at least $557,509 - an amount which has not yet been paid to SSL.

To this same end, the parties dispute whether SSL was permitted to bill SMS for "out-of-scope" development and support work it provided to the U.S. sub-licensees. SMS alleges that SSL cannot bill for out-of-scope work unless it provided SMS with a change of request form prior to performing such work. On the other hand, SSL alleges that under the Agreement, it was not required to submit a change of request form and the only contractual requirement was for SSL's work to be requested by SMS. SSL says it obtained approval from SMS for all out-of-scope work it conducted and SSL only performed this work at the request of SMS. SMS denies

31

this.  If you find that SMS requested the out-of-scope work performed by SSL and the Agreement did not require SSL to file a change of request for to be submitted, then you must find for SSL.

Additionally, SMS alleges that SSL overbilled SMS for work to escape financial difficulties.  SSL asserts that SMS refused to pass-on the expense of SSL's work to the U.S. sub-licensees because SMS wanted to provide their customers with a superior product at minimal cost.  SSL also assets that SMS was not prohibited under the contracts that SMS had with each U.S. sub-licensee from passing on this cost, and indeed payment for out-of-scope was contemplated in those contracts as evidenced by Schedule A that provides for a payment of a "daily rate" for out-of-scope services.  SSL further alleges that SMS never had any intention of charging the U.S. sub-licensees for many of the services SSL provided, and SMS is attempting penalize SSL for SMS' own failure to properly bill its customers.  If you find that SMS failed to bill the U.S. sub-licensees, I instruct you that you that this has no effect on SSL's defenses to SMS' claims against SSL for breach of contract.

SMS also claims that SSL did not support SMS in pursuing new business opportunities and that SSL hampered new opportunities by requesting pre-approval for new contracts SMS entered into with licensees.  SSL refutes these claims and argues that its practice of seeking pre-approval for new contracts was implemented because SMS had been promising customers too much for too little under the prior sub-license agreements.

SMS also alleges that new business opportunities, such as the Unilever contract, were hampered because SSL refused to approve those contracts unless SMS made the payments that SSL demanded.  SSL states that its rejection of the proposed Unilever contract that SMS had presented was a legitimate business decision because the work required to meet Unilever's needs

32

exceeded the amount set forth in the proposed contract. SSL further alleges that in the instance of Unilever, it was SMS that dragged its feet in February 2010 on closing that deal and SMS did this so it could steer Unilever's business to Rivo.

Which party you believe regarding all of these issues is a question of fact and therefore it is up to you the jury to decide whether SSL breached the Agreement in the ways SMS alleges based on the evidence that has been presented to you.

Post-Termination Claims Asserted by SMS

Before we can analyze the viability of claims that SMS alleges arose after SMS terminated the Agreement, you should understand what the Agreement provided for in the instance of termination. Section 11 of the Agreement provides that upon the termination of the Agreement:

1.    all outstanding sums payable by SMS to SSL are immediately due and payable;

2.    all rights and licenses under the Agreement are ceased;

3.    SMS can no longer exploit any AIRSWEB products or SSL's intellectual property or proprietary rights;

4.    SMS must co-operate with SSL to cancel the licenses registered pursuant to the Agreement and execute all documents and take whatever acts are necessary to do so;

5.    SMS shall return all technical and promotional material related to AIRSWEB; and

6.    SMS shall return all copies of AIRSWEB in its possession, together with full contact details of all customers and potential customers including a copy of the contracts between SSL and such customers.

One of the ways SMS claims that SSL breached the Agreement was SSL's take-over of customer hosting and data after SMS terminated the Agreement. If you find that pursuant to the Agreement, SMS did not have a continued right to license AIRSWEB after termination, then you cannot find for SMS on this claim.

33

A.    _If There Was a Breach, Was it Material?_

If you find that SSL did breach the Agreement, you must also determine if that breach was "material."   A material breach is a failure to do something that is so fundamental to a contract that the failure to perform that obligation defeats the essential purpose of the contract or makes it impossible for the other party to perform under the contract.   In other words, for a breach to be material, it must "go to the root" or essence of the agreement between the parties, or be one which touches the central purpose of the contract and defeats the object of the parties in entering into the contract.   Where a breach causes no damages or prejudice to the other party, it may be deemed not to be material.

Here, SMS has claimed that SSL breached the Agreement by not placing the source code and computer files for AIRSWEB in an escrow account controlled by SMS' attorney.

SSL admits to not delivering the source code to SMS' attorney, but notes that there has been no triggering event requiring it to do so.  SSL alleges that its source code, if delivered to SMS' attorney, would be shared with SMS for the purpose of providing it to Rivo, an SSL competitor with whom Ms. Ducker now works.  SSL has negotiated an agreement with SMS' former clients to place SSL's source code in the hands of a neutral escrow agent.

On May 5, 2010, this Court ruled as follows:

> The Court is simply not persuaded on the present record that the fact that SSL has decided to place the source code in escrow with an UK escrow agent pursuant to a new escrow agreement, rather than placing the source code in escrow with Scarola Ellis pursuant to the April 2009 Escrow Agreement, jeopardizes SMS's relationships with its customers or threatens the viability of SMS's business.

Here it is not disputed by either party that SSL is still in business while SMS no longer conducts any business.

If you find that SSL's act of not depositing the source code with SMS' attorney was relatively minor, it was not "material" and SMS cannot prevail on its breach of contract claim.

Based on *Metro. Nat. Bank v. Adelphi Academy*, 23 Misc. 3d 1132(A), 886 N.Y.S.2d 68 (Sup. Ct. Kings Co. 2009).

4.    **Damages**

My charge to you on the law of damages must not be taken as a suggestion that you should find for SMS. It is for you to decide on the evidence presented and the rules of law I have given you whether SMS is entitled to recover from SSL. If you decide SMS is not entitled to recover, you need not consider damages. Only if you decide that SMS is entitled to recover will you consider damages.

A.    *Generally*

The basic principle of damages in a contract action is to leave the injured party in as good a position it would have been if the contract had been fully performed. It is equally fundamental that the injured party should not recover more from the breach than the party would have gained had the contract been fully performed. In the absence of any allegation of fact showing damage, the mere fact that a party breached the contract is insufficient to sustain a complaint for breach of contract. A party asserting breach of contract must establish that the breach caused the damages claimed.

Based on N.Y. Pattern Jury Instr., Civil 4:20 (3d ed. Dec. 2011).

B.    *Causation*

Damages cannot be awarded on the basis of conjecture and guess work. An award of damages is limited to consequences which are the direct and proximate result of the wrong. By "direct cause" I mean damages that can be directly traced to a breach of a contract. By

"proximate cause" I mean a cause sufficiently related to the damages SMS alleges to have sustained as a result of SSL's breach.

No damages can be awarded except those supported by proof that, at least to a reasonable degree, is certain. Damages which are uncertain, contingent, or speculative, or which are remote and cannot be directly traced to the breach of contract, or which are not reasonably capable of computation, are not recoverable and you should not award any such damages.

If you find that the damages SMS' claims either (a) are not sufficiently related to the damages SMS alleges to have sustained or (b) are not directly traceable to the alleged breach, then you must rule in favor of SSL.

36 N.Y. Jur. 2d Damages § 14 (Sep. 2012).

C.    _Loss of New Business Opportunities_

Loss of future profits as damages for breach of contract can only be permitted if three conditions are met. "First, it must be demonstrated with certainty that such damages have been caused by the breach and, second, the alleged loss must be capable of proof with reasonable certainty. In other words, the damages may not be merely speculative, possible or imaginary, but must be reasonably certain and directly traceable to the breach, not remote or the result of other intervening causes. [Third], there must be a showing that the particular damages were fairly within the contemplation of the parties to the contract at the time it was made. If it is a new business seeking to recover for loss of future profits, a stricter standard is imposed for the obvious reason that there does not exist a reasonable basis of experience upon which to estimate lost profits with the requisite degree of reasonable certainty."

_Kenford Co., Inc. v. Erie County_, 67 N.Y.2d 257, 261, 493 N.E.2d 234 (1986).

36

SMS was a start-up company. It is claiming losses for lost future business opportunities, notably royalties it can no longer collect from customers it licensed AIRSWEBS to under the Agreement and its loss of hosting charges. As noted earlier, if you find that SMS had no right to collect royalties for software licensed to SMS under the Agreement due to SMS' termination of that Agreement, then you cannot award SMS damages for that loss. If you find that SMS still has the right under the Agreement, then you must find: (1) that SMS demonstrated with certainty that the loss of royalties have been caused by SSL's breach; (2) the alleged loss of royalties must be capable of proof with reasonable certainty; and (3) the loss of future royalties were fairly within the contemplation of both SSL and SMS at the time the Agreement was made. If you do not find all three of these factors present, then you cannot award damages for lost future royalties.

Additionally, because SMS is a new business seeking to recover for loss of future profits, a stricter standard is imposed for the obvious reason that there does not exist a reasonable basis of experience upon which to estimate lost profits with the requisite degree of reasonable certainty.

In regards to SMS' claim for lost future profits relating to hosting charges, the same analysis applies. Therefore you must determine whether: (1) SMS demonstrated with certainty that the loss of future hosting charges have been caused by SSL's breach; (2) the alleged loss of hosting charges must be capable of proof with reasonable certainty; and (3) the loss of future hosting charges were fairly within the contemplation of both SSL and SMS at the time the Agreement was made. If you do not find all three of these factors present, then you cannot award damages for lost future hosting charges.

Remember, because SMS is a new business seeking to recover for loss of future profits, a stricter standard is imposed for the obvious reason that there does not exist a reasonable basis of experience upon which to estimate lost profits with the requisite degree of reasonable certainty.

D.    *Did SMS Generate Profit?*

Moreover, if you find that SMS, a new business was operating "in the red" or "at a loss", it cannot be awarded lost profits because there is no history of profits on which to base an award. Therefore, if you determine that SMS' expenses in running its business, such as the rent it had to pay, royalties it owed, salaries paid to employees and any other expenses, outweighed the money that SMS was able to generate, then you cannot award SMS any damages.  Here, SMS' federal tax returns show consistent losses for each year that SMS was in business.

Based on *Awards.com, LLC v. Kinko's, Inc.*, 42 A.D.3d 178, 185, 834 N.Y.S.2d 147, 154 (1st Dep't 2007), aff'd, 14 N.Y.3d 791, 925 N.E.2d 926 (2010).

E.    *Mitigation*

As a general rule, an injured party has a duty to mitigate, or lessen the damages it may sustain from a breach of contract.  No recovery can be made for losses which the person injured might have prevented by reasonable efforts and expenditures.

If you find that SMS was damaged, you must also decide whether it mitigated its damages.  The burden of showing that damages were not mitigated rests on SSL.  This means that SMS need only present evidence as to one measure of damages, and that measure will be used if neither party presents evidence showing that the damages should be mitigated.

In this case you need to determine whether SMS could have mitigated its damages by not terminating the Agreement.  Therefore, based on the evidence presented, you must decide

38

whether SMS could have mitigated its damages by continuing to work with SSL and by negotiating contracts with customers that SSL would approve.

Based on 4A N.Y. Prac., Com. Litig. in New York State Courts (Robert L. Haig) § 71:40 (3d ed. Sep. 2012).

       F.    *Set-Off*

If you find that SMS sustained damages due to SSL's breach of the Agreement but SSL sustained even greater damages due to SMS' breach of the Agreement, then you must "set-off" the difference between the two amounts and enter judgment for the party that is owed a payment after the set-off.

       (6)    SMS' Conversion Claim against SSL:

"To establish a cause of action to recover damages for conversion, 'the plaintiff must show legal ownership or an immediate superior right of possession to a specific identifiable thing and must show that the defendant exercised an unauthorized dominion over the thing in question . . . to the exclusion of the plaintiff's rights.'"  Here, the parties dispute whether SMS had an immediate superior right of possession concerning the customer data and hosting for U.S. customers using AIRSWEB products.

Based on *Eight In One Pet Prods. v. Janco Press, Inc.*, 37 A.D.3d 402, 828 N.Y.S.2d 899 (2d Dep't 2007).

Legal Ownership or Immediate Superior Right of Possession

If you find that SMS has not demonstrated that it had an immediate superior right of possession over SSL concerning customer information and hosting for the U.S. customers then SMS cannot prevail on its conversion claims against SSL, and you must rule in favor of SSL.

Based on *Crabtree v. Tristar Auto. Group, Inc.*, 776 F. Supp. 155 (S.D.N.Y. 1991).

Here, SMS claims that it was legally entitled to the customer data and hosting for U.S. clients using AIRSWEB products after SMS terminated the Agreement. Section 11 of the Agreement provides that upon the termination of the Agreement:

1.      all outstanding sums payable by SMS to SSL are immediately due and payable;

2.      all rights and licenses under the Agreement are ceased;

3.      SMS can no longer exploit any AIRSWEB products or SSL's intellectual property or proprietary rights;

4.      SMS must co-operate with SSL to cancel the licenses registered pursuant to the Agreement and execute all documents and take whatever acts are necessary to do so;

5.      SMS shall return all technical and promotional material related to AIRSWEB; and

6.      SMS shall return all copies of AIRSWEB in its possession, together with full contact details of all customers and potential customers including a copy of the contracts between SSL and such customers.

If you find, pursuant to Section 11 of the Agreement, that SMS did not have a superior right over SSL to possess customer information, then you must find in favor of SSL.

SMS also claims that SSL committed conversion by taking-over hosting services for U.S. sub-licensees using AIRSWEB products. If you find that pursuant SMS' termination of the Agreement, SMS did not have a continued right to license or exploit AIRSWEB products, then you cannot find for SMS on this claim as SMS would not have legal ownership or an immediate superior right of possession over this hosting.

Additionally, if you find that SMS did not pay Rackspace for hosting services and that Rackspace would have ceased proving hosting services to the U.S. sub-licensees, you must also find for SSL.

40

### Did SMS Prove that SSL Acted Unlawfully or Wrongfully or is SMS Instead Alleging that SSL Breached the Agreement?

To successfully assert a claim for conversion, SMS must also show that the acts SSL took were unlawful or wrongful, rather than a mere violation of the Agreement. A conversion claim can only succeed if the party alleges a wrong that is distinct from a breach of contractual obligations. If you find that SMS failed to introduce evidence showing any unlawful or wrongful acts by SSL that distinguish its conversion claim from his breach of contract claim, you must find for SSL.

Stated differently, if SMS' conversion claim is nothing more than a recasting of its contract claim, you must find for SSL.

Based on *Calcutti v. SBU., Inc.*, 223 F. Supp. 2d 517, 523 (S.D.N.Y. 2002) and *Stadt v. Fox News Network LLC*, 719 F. Supp. 2d 312 (S.D.N.Y. 2010).

### Are the Damages that SMS request different from Damages It Would Seek for a Breach of Contract?

SSL seeks the return of customer data as well as any monetary damages or costs in connection with SSL's actions. If you find that the: (1) the damages SMS seeks for conversion are the same as those it seeks on its contract claim; or (2) that SMS made no arguments distinct from those made in its claims for breach of contract, you must rule in favor of SSL.

Based on *Riverside Mktg., LLC v. Signaturecard, Inc.*, 425 F. Supp. 2d 523, 536-37 (S.D.N.Y. 2006).

### Proper Measure of Damages for Conversion

My charge to you on the law of damages must not be taken as a suggestion that you should find for SMS. It is for you to decide on the evidence presented and the rules of law I have given you whether SMS is entitled to recover from SSL. If you decide SMS is not entitled to

recover, you need not consider damages.  Only if you decide that SMS is entitled to recover will

you consider damages.

"Recovery under New York State conversion law is limited to the value of the property at the time and place of seizure plus interest.

> The modern law of conversion is derived from the common law action of trover which redressed an interference with one's interest in a chattel that was substantial enough to justify compelling the wrongdoer to pay for it as in a forced sale.  That is to say, the measure of damages to which the plaintiff was entitled to the value of the property at the time and place of conversion.

> . . .

> [T]he usual measure of damages is the value of the property at the time and place of conversion, plus interest . . .  profits lost are generally disallowed . . . though they may be recoverable if they may reasonably be expected to follow from the conversion.  Lost profits are generally disallowed because the fixed legal interest rate replaces the uncertain and indefinite profits that a plaintiff might have made either from the possession of the goods or their equivalent in money."

*E. Coast Novelty Co., Inc. v. City of New York*, 842 F. Supp. 117 (S.D.N.Y. 1994) (internal citations and quotations omitted).

Here, SMS alleges that is was entitled the customer data and hosting for U.S. sub-licensees using AIRSWEB products and that SMS has suffered damages as a result of being deprived the same. SSL alleges that even if SMS did have a superior right of possession to customer data and hosting it SMS has suffered no damages because: (1) SMS actually retained the customer data in violation of the Agreement; and (2) SMS was not even paying Rackspace for hosting and but for SSL's intervention, Rackspace would have terminated hosting services for the U.S. customers. These are questions of fact and therefore it is up to you the jury to decide whether SMS has incurred any damages relating to this claim based on the facts presented to you during this trial and the instructions I have provided you.

Dated: New York, New York
      October 10, 2012

                     BALBER PICKARD MALDONADO
                     & VAN DER TUIN, PC

                     By: _____ s/ Roger Juan Maldonado
                           Roger Juan Maldonado
                           Nicole Haff
                           1370 Avenue of the Americas
                           New York, New York 10019
                           (212) 246-2400
                           RMaldonado@balberpickard.com

                     *Attorneys for Defendant and Counterclaim Plaintiff Safety Software Limited*

# Exhibit A

## VERDICT SHEET FOR SAFETY SOFTWARE LIMITED'S CLAIMS AGAINST SAFETY MANAGEMENT SYSTEMS, INC. AND CHRISTIEN DUCKER

We, the Jury, find unanimously as follows:

*Licensing Agreement*

1.    Do you find that Safety Software Limited ("SSL") proved by a preponderance of the evidence that it fulfilled its obligations under the Licensing Agreement?

Yes:_____    No:_____

2.    Do you find that SSL proved by a preponderance of the evidence that Safety Management Systems, Inc. ("SMS") did not fulfill its obligations under either Sections 2, 3, 5, 8 or 9 of the Licensing Agreement, and that at least one of those sections went to the core of the Licensing Agreement?

Yes:_____    No:_____

3.    Do you find that SSL proved by a preponderance of the evidence that its damages relating to the Licensing Agreement were proximately caused by SMS?

Yes:_____    No:_____

4.    If you answered "yes" to Questions #1-3, then what damages is SSL entitled to recover?

$_____

6.    If you provided a damages amount above, what sections of the Licensing Agreement did SMS materially breach?

_____

*Quantum Meruit*

1.  Do you find that certain of the services SSL billed to SMS were not covered under the Licensing Agreement?

Yes:_____    No:_____

2.  Do you find that SSL proved by a preponderance of the evidence that it provided these services in good faith?

Yes:_____    No:_____

3.  Do you find that SSL proved by a preponderance of the evidence that those services were accepted?

Yes:_____    No:_____

4.  Do you find that SSL proved by a preponderance of the evidence that SSL expected payment from SMS for its services?

Yes:_____    No:_____

5.  If you answered "yes" to Questions #1-4, what is the reasonable value of services rendered by SSL?

$_____

*Loan Agreement*

1.  Do you find that SSL proved by a preponderance of the evidence that it fulfilled its obligations under the agreement it had to loan SMS money?

Yes:_____    No:_____

2.  Do you find that SSL proved by a preponderance of the evidence that SMS did not fulfill its obligations to pay back SSL under the loan agreement and that its failure to do so went to the core of that agreement?

46

Yes:_____    No:_____

3.    Do you find that SSL provided by a preponderance of the evidence that its damages were proximately caused by SMS?

Yes:_____    No:_____

4.    If you answered "yes" to Questions #1-3, then what damages is SSL entitled to recover?

$_____

*Piercing the Corporate Veil*

1.    Do you find that SSL proved by a preponderance of the evidence that Ms. Ducker dominated and controlled SMS?

Yes:_____    No:_____

2.    Do you find that SSL proved by a preponderance of the evidence that Ms. Ducker used SMS to commit a fraud or wrong against SSL?

Yes:_____    No:_____

3.    If you answered "yes" to both Question #1 and Question #2, did SSL prove, by a preponderance of the evidence, that Ms. Ducker used her domination and control over SMS to commit a fraud or wrong that damaged SSL?

Yes:_____    No:_____

4.    If you answered "yes" to Question #4, what amount, if any did Ms. Ducker damage SSL?

$_____

_____              _____
Date                                                      Foreperson

47

**VERDICT SHEET FOR SAFETY MANAGEMENT SYSTEMS, INC.'S CLAIMS
AGAINST SAFETY SOFTWARE LIMITED**

We, the Jury, find unanimously as follows:

*Breach of Licensing Agreement*

1.    Do you find that SMS proved by a preponderance of the evidence that it fulfilled

its obligations under the Licensing Agreement, by: (a) making timely royalty payments to SSL

(b) making timely payments for services that SSL provided to SMS' clients; (c) ceasing its

exploitation of AIRSWEB after SMS terminated the Licensing Agreement; (d) obtaining the

insurance coverage required under the Licensing Agreement; (e) steering all business to SSL

during the period that the Licensing Agreement was in effect; or (f) encouraging its employees to

protect SSL's confidential information.

Yes:____      No:____

2.    Do you find that SMS proved by a preponderance of the evidence that SSL did

not fulfill its obligations under Sections 4-6 of the Licensing Agreement?

Yes:____      No:____

3.    If you answered "yes" to Question #3, do you find that SSL's failure to fulfill its

obligations under Sections 4-6 of the Licensing Agreement, went to the core of the Licensing

Agreement?

Yes:____      No:____

a.    If you answered "no" to Question #1 or Question #2 or Question
#3, you have completed your jury service.  Please turn in your verdict
sheet.

b.    If you answered "yes" to Question #1 and Question #2 and Question #3,
proceed to Question #4.

4.    Do you find that SMS proved by a preponderance of the evidence that its

damages were proximately caused by SSL and not by its own conduct or Ms. Ducker's conduct causing SMS to breach the Licensing Agreement?

Yes:____    No:____

    a.    If you answered "no" to Question #4 you have completed your jury service.

    b.    If you answered "yes" to Questions #1-3 and "yes" to Question #4 , then what damages is SMS entitled to recover?
    $_____

*Escrow Agreement*

1.    Do you find that SMS proved by a preponderance of the evidence that it fulfilled its obligations under the Escrow Agreement?

Yes:____    No:____

2.    Do you find that SMS proved by a preponderance of the evidence that SSL did not fulfill its obligations under the Escrow Agreement?

Yes:____    No:____

3.    If you answered "yes" to Question #3, do you find that SSL's act of placing the AIRSWEB source code with a neutral third-party located in the United Kingdom, instead of placing it in escrow with Mr. Scarola, violated the core purpose of the Escrow Agreement?

Yes:____    No:____

    a.    If you answered "no" to Question #1 or Question #2 or Question #3, you have completed your jury service. Please turn in your verdict sheet.

    b.    If you answered "yes" to Question #1 and Question #2 and Question #3, proceed to Question #4.

4.    Do you find that SMS proved by a preponderance of the evidence that its

damages were proximately caused by SSL and not by its own conduct or Ms. Ducker's conduct in breaching the Escrow Agreement?

Yes:_____    No:_____

    a.    If you answered "no" to Question #4 you have completed your jury service.

    5.    Do you find that SMS had the right require SSL to place the AIRSWEB source code into an escrow account with Mr. Scarola after SMS had terminated the Licensing Agreement?

Yes:_____    No:_____

    c.    If you answered "yes" to Questions #1-5, then what damages is SMS entitled to recover?

$_____

## Conversion

Do you find that SMS proved by a preponderance of the evidence that it had an immediate superior right of possession over SSL concerning customer information and hosting for the U.S. companies using AIRSWEB, after SMS terminated the Licensing Agreement?

Yes:_____    No:_____

    a.    If you answered "no" to Question #1 you have completed your jury service.

    b.    If you answered "yes" to Question #1, you may proceed onto Question #2.

    2.    Do you find that SMS proved by a preponderance of the evidence that SSL breached the Licensing Agreement it had with SMS by taking the U.S. companies' information and hosting after SMS terminated the Licensing Agreement?

Yes:_____    No:_____

50

      a.     If you answered "yes" to Question #2 you have completed your jury service.

      b.     If you answered "no" to Question #3, you may proceed onto Question #2.

3.     Do you find that damages SMS seeks for conversion are the same it seeks for its breach of contract claim?

Yes:_____     No:_____

      a.     If you answered "yes" to Question #3 you have completed your jury service.

      b.     If you answered "no" to Question #3, you may proceed onto Question #4.

4.     Do you find that arguments SMS makes in support of its conversion claim are the same it makes for its breach of contract claim?

Yes:_____     No:_____

      a.     If you answered "yes" to Question #4 you have completed your jury service.

      b.     If you answered "no" to Question #4, you may proceed onto Question #5.

5.     What was the value of the Property at the time it was seized?

$_____

_____                       _____
Date                                                             Foreperson

10 Civ. 1593 (KBF)

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

SAFETY MANAGEMENT SYSTEM, INC.,

Plaintiff,

- against -

SAFETY SOFTWARE LIMITED,

Defendant, Counterclaim Plaintiff

SAFETY MANAGEMENT SYSTEMS, INC. And
CHRISTIEN DUCKER,

Counterclaim Defendant.

**JURY RELATED MATERIALS**

**Balber Pickard
Maldonado & Van Der Tuin, PC**

1370 Avenue of the Americas
New York, New York 10019-4602
212 246-2400

Attorneys for Defendant Safety Software Limited